J-S15037-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOHN THOMAS POLEN, IV | : | |
| | : | |
| Appellant | : | No. 1619 WDA 2019 |

Appeal from the Judgment of Sentence Entered July 23, 2019
In the Court of Common Pleas of Potter County Criminal Division at
No(s):  CP-53-CR-0000134-2018

BEFORE:   BENDER, P.J.E., OLSON, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                **FILED MARCH 26, 2020**

Appellant, John Thomas Polen, IV, appeals from the judgment of

sentence entered in the Court of Common Pleas of Potter County following his

open plea of *nolo contendere*[1] to the sole charge of attempted murder of the

first degree, 18 Pa.C.S.A. § 901(a).  After a careful review, we affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] Appellant entered an ***Alford*** plea pursuant to ***North Carolina v. Alford***, 400 U.S. 25, 91 S.Ct. 160 (1970).  An ***Alford*** plea is a *nolo contendere* plea in which the defendant does not admit guilt but waives trial and voluntarily, knowingly, and understandingly consents to the imposition of punishment by the trial court.  ***Id.*** at 37, 91 S.Ct. 160.  Provided the record reflects a factual basis for guilt, the trial court may accept the plea notwithstanding the defendant's protestation of innocence.  ***Id.***  Typically, as in the present case, a defendant is exchanging his plea for a reduced sentence or reduced charges.

The relevant facts and procedural history are as follows: On June 15, 2018, Appellant shot his unarmed ninety-one-year-old grandfather ("the victim") outside of Appellant's family's home, and the Commonwealth charged Appellant with attempted murder of the first degree, aggravated assault, and reckless endangerment.[2]   Represented by counsel, on June 13, 2019, Appellant entered an open plea of *nolo contendere* to the sole count of attempted murder of the first degree, and in exchange, the Commonwealth *nol prossed* the remaining charges.

On July 23, 2019, represented by counsel, Appellant proceeded to a sentencing hearing.  At the hearing, the trial court acknowledged that it reviewed a presentence investigation report ("PSI"), letters provided by the defense, the report of forensic psychiatrist Clarence Watson, M.D., the sentencing guidelines, a report from the state police, statements from Appellant's family members, a victim impact statement from the victim, and Appellant's pre-sentence memorandum.  N.T., 7/23/19, at 1-2.

The Commonwealth informed the trial court that the victim suffered serious bodily injury, and thus, the offense gravity score was fourteen.  *Id.* at 3.  The Commonwealth noted the standard guideline range was 7½ years to 20 years in prison.  *Id.* at 25.

_____

[2] The victim survived the shooting; however, he "lost use of his right arm as a result of th[e] shooting." N.T., 7/23/19, at 2-3.

Appellant's attorney presented sentencing testimony from Benjamin Olney, who is a funeral home director. *Id.* at 5. Mr. Olney testified his son and Appellant are friends, he has known Appellant since Appellant was in the sixth grade, and he conducted the funeral services for three of Appellant's grandparents. *Id.* Mr. Olney testified Appellant is "a polite, intelligent, respectful, mild mannered young man. He was highly regarded by his peers in high school." *Id.* Further, Mr. Olney indicated Appellant has been a guest in his home on numerous occasions, and Appellant is "a fine young man." *Id.*

Mr. Olney admitted that the last time he spent substantial time with Appellant was four years ago when Appellant was a senior in high school. *Id.* at 6. He testified he was surprised that Appellant shot the victim. *Id.*

Susan Valentine, who was the principal of the high school that Appellant attended, testified Appellant was a "stand out." *Id.* at 8. She indicated he "is a wonderful person. He was well respected by peers, the teachers." *Id.* She testified every staff person at the school, as well as the students, "thought highly of him[,]" and "he is a kind soul." *Id.* at 8-9. Ms. Valentine admitted she has not seen Appellant as frequently as she did when he was in high school; however, she had no reason to believe Appellant "is a different person." *Id.* at 9.

Appellant's father testified that his mother and father (the victim) were involved in a divorce matter, and his mother died from cancer in 2017. *Id.* at 10. Appellant's father confirmed he submitted a statement to the sentencing

court, and the statement reflected a history of extensive negative interaction between Appellant's father, Appellant's grandmother, and the victim.  ***Id.*** at 11.  The trial court specifically noted that it had carefully read the statement from Appellant's father prior to the sentencing hearing.  ***Id.*** at 12.

Appellant's father testified that, since the day of the shooting, the victim has continued acting negatively towards the family, including parking in front of the house and yelling obscenities at them frequently. ***Id.*** at 13.  The trial court specifically noted it was aware that there were ongoing issues with the family. ***Id.*** at 14.

Appellant's father indicated that throughout the years there have been multiple criminal and civil proceedings between him and the victim.  However, many of the criminal matters were later dismissed and the civil proceedings were discontinued. ***Id.*** at 14-15.

At this point in the sentencing hearing, Appellant's attorney highlighted for the trial court the following portion of the state police report with regard to the instant shooting:

> "Next, [the victim] closed the front passenger side door and opened the rear sliding door of his vehicle.  Once again he began to look for his camera with negative results."  And by way of background, [the victim] stated that's why he stopped that day to look for his camera.  Continuing the quote, "[the victim] stated he did not spend a lot of time looking for his camera, three or four minutes.  [The victim] closed [the] rear sliding door and began to walk toward [the] front of his vehicle.  He goes on to recount being approached by [Appellant] and seeing the gun."  And quote on top of the next page…[the victim] indicated that, "[Appellant] said, don't you take another stop or I'll shoot you." [The victim] further indicated that [Appellant] was carrying a gun with both hands.

- 4 -

[The victim] recalled thinking that [Appellant] was quote "just a kid, he ain't gonna do nothing to nobody." End quote. And with regard to the camera one of the first responders, David Ransom, indicated that when he arrived on the scene he believed there was a camera on [the victim's] belt, which is consistent with what [Appellant] said in his statement [that he believed the victim] was reaching for something on his belt. I just want to point those facts out to the Court.

*Id.* at 16-17.

In response, the trial court stated:

Just for everyone's hearing in the courtroom, I didn't let the attorneys get into much about the facts about what this family has gone through to get to this place. I am well aware of the PFA. I'm well aware of the violations of the PFA, it's all contained within the documents provided to me. I'm well aware of the family disputes. To suggest that I'm limiting these people because I don't want to hear this, that's not true[.] I am well aware of all that information.

*Id.* at 17.

In response, Appellant's counsel informed the trial court that it appreciated the court's understanding, but counsel indicated:

[The victim] indicated that he thought that day, you know, this is just a boy, he ain't gonna do nothing. [The victim] was out of his vehicle, whether he was on the grass [in front of Appellant's house], whether he was on the road, it's [the] first time in all of these years that he had exited his vehicle. [Appellant's father's] car was not there, [Appellant's mother] was in the house. A loaded gun was kept on the hutch by [Appellant's father] basically to address exactly this type of situation. And it just appears that years of this young man 21, 22 years [of] age at the time living at that house, being subjected almost on a daily basis to some kind of harassing conduct by [the victim], threats, all kinds of statements, it just plain boiled over, as [Dr.] Watson pointed out in his report if I could lay my hands on that quickly, Dr. Watson specifically referred to [Appellant's] state of mind quote, "It is noted that [Appellant] and his parents provided consistent statements regarding ongoing, intense, adversarial relationship

- 5 -

with [the victim], victim's violent history. During my evaluation, [Appellant] provided a clear description of his heightened emotional state at the time of the offense and his underlying concerns regarding his and his mother's safety." So there you have [a] 22-year old young man with his history of what has been going on and threats, seeing [the victim] out of his vehicle, reaching towards something black on his belt, having shouted at him three times, what are you doing here, get out of here, and [the victim] thinking that's a boy, he ain't gonna do nothing. [The victim] was wrong. And even a young boy can only take about so much when it comes to threats directly to his mom and dad with his mother alone in the house and sometimes we do reap what we sow[.]

*Id.* at 18-19.

At this point, Appellant made a statement to the court. Specifically, he stated the following:

I was put in a situation where I felt not only I was threatened but my mother was. I think anyone can do anything to protect their own family especially their mother. A normal person I feel when they have someone with a gun drawn on them will react with some sort of submissive gestures. [The victim] didn't, he tried to take man of the situation, he made a reach for something, I reacted to that, I thought I was in danger. Afterwards—my intent wasn't to kill, never was—I went, called [an] ambulance. I offered what aid I could without putting my, without putting myself in danger. I was cooperative, I stayed on [the] phone with dispatch, I helped along with the situation. I'm not a violent person.

*Id.* at 19.

The Commonwealth acknowledged that, prior to the shooting, Appellant had a good reputation in the community. *Id.* at 20. Also, the Commonwealth noted it was not challenging the "unfortunate and hostile history" between the

victim, the victim's ex-wife, and the victim's son.[3]  *Id.* However, the Commonwealth indicated it disagreed with the assertion that Appellant had a direct history of violence with the victim and, in fact, he had no contact with the victim in the five years prior to the shooting.  *Id.* at 20-21. The Commonwealth argued "[t]here was never any fighting or aggressive fighting or threats between these two individuals whatsoever." *Id.* at 21.

Moreover, the Commonwealth indicated it disagreed with Appellant's version of the events on the day of the shooting insomuch as the Commonwealth contended there was no need for Appellant to approach the victim with a gun, let alone shoot him, when there was no retaliation or aggressive behavior on the part of the victim on that day.  *Id.*  The Commonwealth reminded the trial court that Appellant was the initial aggressor who confronted the victim outside of Appellant's home with a gun, and shot the victim who was unarmed.  *Id.* at 22.

The Commonwealth noted that, while Appellant had a good reputation prior to the shooting, and he may have been put "in the middle of" a "horrible family history," the fact remained that Appellant shot the unarmed victim, perhaps with the motive of anger.  *Id.* at 23.  The Commonwealth noted that, during his allocution, Appellant did not apologize to the victim for the shooting or the pain he caused to the victim.  *Id.* at 24.

_____

[3] This refers to Appellant's grandfather, Appellant's grandmother, and Appellant's father, respectively.

The victim was permitted to make a statement to the trial court. He stated, "I'm only going to tell you one thing. I hadn't talked, I hadn't said one word to [Appellant] from the time he was 11 years old until the time he shot me, that's all I have to say, not one word." *Id.*

After receiving all information and hearing the testimony, the trial court stated the following:

> I can tell you this case has been one that I have wrestled with as to do justice, which is what the Court is required to do. There [are] a lot of victims here. Certainly, [the victim] is a victim, he was shot, [and] he could have died. Regardless of his actions in the past, nobody deserves death or attempts to kill people. I am aware of the history here. I suspect that this young man for years had that information in his ear, your grandfather did this, your grandfather did that or he was charged or he had a PFA or whatever happened with him and his wife and with [Appellant's] father. So I suspect that years and years of receiving that information created in this young man some emotion and I think it all boiled over on June 15th of 2018 after hearing seven years of information concerning grandfather, and I suspect he panicked a bit, walked out and did something he probably wishes he never did.
>
> So I've heard certainly some wonderful things about [Appellant]. I understand [he] graduated at the top of his class at Northern Potter, [received] a scholarship to Saint Bonaventure, certainly [an] intelligent young man majoring in biology, got his senior year, didn't quite finish, came home to take care of his grandmother. I'm aware of that. I'm aware he is an EMT. I'm aware of helping family and friends and a very kind, compassionate, generally peaceful young man. Balance that against [a] young man who takes a firearm and approaches his grandfather and discharges the firearm at least into [the] upper torso of his grandfather on the day in question. So we have a real dichotomy of a peaceful good citizen against this back drop of his shooting of his grandfather on the day in question. So I have considered that and I'll tell you everything that I've considered in reaching my decision today. I've considered the age of this young man, he's 22. I'm told that [the] frontal lobe of the brain doesn't develop for a male until about age 26. He doesn't have all the

- 8 -

reason and judgment he ought to have as a full adult, and I consider the fact that he was 22, consider the fact that he had no criminal record, however, also consider the gravity of the offense. This was [*sic*] could have easily been a death of [a] grandfather. I've considered all the presentence information. I've considered the victim impact statements. I've considered all [of] the evidence here today. I've considered the nature of the offense, whether there is any mitigating or justification factors. Some people will after I enter the sentence will say he received too little, that he almost killed his grandfather and this young man ought to go away for a long, long time in view of that act. And some people will say he received too much, he's a good young man, had a great record up until June 15th of 2018. And I wrestled with this, didn't sleep well last night having to make these decisions, but [the] buck has to stop with me and I have to do my job.

So in Pennsylvania we have what are called sentencing guidelines. For everyone's hearing here in the audience there is what they call standard range of sentence, which is [the] range generally given to people that commit offenses. [The] [s]entencing commission has established that this young man within standard range of sentence would receive 7 and ½ to 20 years, anywhere within that realm would be a standard sentence….There is also what is called mitigating range, mitigating factors. If there [are] factors that [the] Court ought to consider, more mercy ought to be given under the circumstances and that range [is] 78 [months]…[to] 156 [months] and anywhere within there would be [the] mitigating range. I understand this young man has been in jail for almost a year. Regardless of what I give him he's got a year of credit. So options available to me does this young man get [a] standard range, mitigated range, or something else.

Based upon all [of] the information, I'm going to sentence him in the mitigated range of sentence and I'm going to be at the low end of that mitigated range. Still means he [has] to go to prison and [has] to serve some time. I can't discount the fact that this gentleman was almost killed and that [Appellant's] behavior on the day in question he has to be held accountable for, but I don't think this is a young man that goes to prison for 20, 40 years. I think he's [a] good young man that made a horrific mistake and it doesn't define your life, [Appellant], [it's] a bump in the road, a big bump for sure, this doesn't define your life. You will be able to get out and do some good things because you're essentially a good person. All the information I have is that this

is a kind young man, but I can't simply disregard what had happened here under these circumstances.

As to Count one, Criminal Attempt, [Appellant] is sentenced to 78 months to 180 months.[4]  No fine.

***

As I said, ladies and gentlemen, this is a good young man that's made a mistake, he's going to have to pay for that, but he's not a throw away, not a bad person, he's a man who made a mistake.  So again I sentence him in [the] mitigated range.  I think that's fair based on all of the information I received concerning this young man's good character and reputation and all of the history that brought us to this point in time.

*Id.* at 26-30, 31 (footnote added).

On August 1, 2019, Appellant filed a timely, counseled post-sentence motion seeking reconsideration of his sentence, and the trial court denied the motion on October 3, 2019.  This timely, counseled appeal followed, and all Pa.R.A.P. 1925 requirements have been met.

On appeal, Appellant's sole issue challenges the discretionary aspects of his sentence.  Specifically, Appellant contends the trial court's imposition of a minimum sentence of 78 months in prison is excessive.  Appellant avers the trial court failed to impose an individualized sentence upon Appellant and failed to sentence him in accordance with 42 Pa.C.S.A. § 9721 by improperly focusing on the gravity of the offense.  Appellant suggests the trial court "paid

_____

[4] Under Pennsylvania's statutory sentencing scheme, in imposing a sentence, the trial judge "shall impose a minimum sentence of confinement which shall not exceed one-half of the maximum sentence imposed."  42 Pa.C.S.A. § 9756(b).  Such occurred in the case *sub judice*.

mere lip service" to the mitigating factors, including Appellant's youth, Appellant's non-violent reputation in the community, the fact Appellant's family endured long-term harassing/aggressive behavior from the victim, and the forensic psychiatrist's report that Appellant "provided a clear description of his heightened emotional state at the time of the offense and his underlying concerns regarding his and his mother's safety." Appellant's Brief at 20, 6 (citation to record omitted).

When an appellant challenges the discretionary aspects of his sentence, we must consider his brief on this issue as a petition for permission to appeal. *See Commonwealth v. Moury*, 992 A.2d 162 (Pa.Super. 2010). Prior to reaching the merits of a discretionary sentencing issue,

> [this Court conducts] a four[-]part analysis to determine: (1) whether [A]ppellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. [720]; (3) whether [A]ppellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

*Moury*, 992 A.2d at 170 (citation omitted).

Here, assuming, *arguendo*, all of these requirements have been met, we conclude Appellant's sentencing issue is meritless.

> It is well-settled that:
>
> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the

- 11 -

sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Gonzalez*, 109 A.3d 711, 731 (Pa.Super. 2015) (quotation omitted).

"Although Pennsylvania's system stands for individualized sentencing, the court is not required to impose the 'minimum possible' confinement." *Moury*, 992 A.2d at 171 (citation omitted). In reviewing the sentence, an appellate court shall have regard for: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the opportunity of the sentencing court to observe the defendant, including any presentence investigation; (3) the findings upon which the sentence was based; and (4) the guidelines promulgated by the commission. *See* 42 Pa.C.S.A. § 9781(d)(1)–(4). These general standards mandate that a sentencing court impose a sentence "consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S.A. § 9721(b).

In the instant matter, the record demonstrates the trial court had the benefit of a PSI. We have stated that:

> When imposing a sentence, a court is required to consider the particular circumstances of the offense and the character of the defendant….Where the sentencing court had the benefit of a [PSI], we can assume the sentencing court was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors.

- 12 -

***Moury***, 992 A.2d at 171 (quotation marks and quotations omitted).

Moreover, as the trial court's statements during the sentence hearing reveal, the trial court properly considered the sentencing guidelines, and carefully imposed an individualized sentence, which reasonably reflected the magnitude of Appellant's crime. The trial court's understanding of the requirements of 42 Pa.C.S.A. § 9721 is clear in that the trial court imposed upon Appellant a sentence consistent with the protection of the public, the gravity of the offense as it related to the victim and the community, and the rehabilitative needs of Appellant.

Furthermore, contrary to Appellant's suggestion, the trial court specifically stated on the record that it considered the report from Dr. Watson, Appellant's youth, Appellant's reputation within the community, and the victim's long-term domestic violence/harassment in imposing sentence upon Appellant. N.T., 7/23/19, at 1-2, 26-30, 31.

Accordingly, as we find no merit to Appellant's discretionary aspects of sentencing claim, we affirm.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/26/2020